Filed 5/15/14   Modified and Certified for Publication 6/13/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | B250566 |
| | (Los Angeles County Super. Ct. No. CK99291) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| A.S., | |
| Defendant and Respondent. | |
| J.L., | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Robert S. Draper, Judge.  Reversed and remanded.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Appellant.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance for Plaintiff and Respondent.

* * * * * * *

J.L., who was seven years old when she was detained by the Los Angeles County Department of Children and Family Services in May 2013, appeals the juvenile court's order declining to assert dependency jurisdiction and dismissing the petition under Welfare and Institutions Code section 300, subdivisions (b) and (d).[1] There was substantial, undisputed evidence that J.L.'s mother, who has been in and out of prison throughout the child's life, left J.L. for two years with relatives who physically and sexually abused her. We conclude the record does not contain substantial evidence to support the order of dismissal, and therefore, we reverse.

## BACKGROUND

Mother was released from prison in November 2012, her latest felony incarceration in a criminal career dating back to 1991. She had left J.L. in the care of J.L.'s maternal cousin, Anthony P., and his girlfriend. Mother testified Anthony was a "second striker" as a result of convictions for terrorist threats he made to loss prevention personnel at a Walmart store where his sister was shoplifting, in an attempt to help her get away. Anthony's 19-year-old brother, Darnell P., also resided in the home. Anthony and Darnell are mother's nephews. Mother testified she knew Darnell's father was a registered sex offender, and his brothers had criminal histories, but she thought Darnell was a "good boy."[2]

After her release from prison, mother did not have stable housing and was receiving dialysis for kidney disease, so she continued to leave J.L. in Anthony P.'s home. Some months after her release, on April 18, 2013, during a visit with J.L., mother saw dried blood in her panties. Mother testified J.L. said it was a urine stain, and mother

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     There are record references to Anthony P. as J.L.'s uncle, but we accept as true mother's testimony that Anthony P. and Darnell P. are her oldest sister's sons, and therefore both are J.L.'s cousins. The court reporter noted mother testified Darnell's last name began with a "T," but all reports in the record state his last name begins with a "P." Although they are brothers, Anthony P. and Darnell P. have different last names and different fathers.

2

called and spoke with Anthony's girlfriend who reported J.L. had been treated for a urinary tract infection. The next week, however, on April 25, J.L. told mother she had been repeatedly sexually abused by Darnell P. Mother took J.L. to the hospital, law enforcement and social workers were brought in, and J.L. gave detailed accounts of what had happened to her. We do not repeat in this opinion all the details of the rapes that J.L. reported to the various professionals who interviewed her, nor their observations of her strange, sexualized behavior and detailed knowledge of sexual matters. It is enough to recite that J.L. reported that, in addition to having been raped by Darnell in her bed "every night," which she said happened "99 times," she was also forced to orally copulate a 13-year-old boy family friend while Darnell watched. Apparently, J.L. was afraid if she told Anthony about Darnell's sexual abuse, Anthony would spank her. It is undisputed that he beat her with a belt when she told him about the incident with the 13-year-old boy family friend, and on many other occasions.

The parties do not dispute that J.L. was sexually and physically abused as briefly summarized above. There is inconsistent evidence as to whether J.L. disclosed the sex abuse to her mother on April 18 or on April 25 (the day before mother took her to the hospital), and whether mother permitted J.L. to be in Darnell P.'s presence between those two dates, and whether mother's delay in seeking medical treatment evidenced her failure to protect J.L. The social worker stated in the detention report that J.L. said she disclosed the sex abuse to her mother on April 18, that she saw Darnell a few days later, and that mother took her to the hospital a week later; though J.L. also reported (after she heard the social worker ask mother why she neglected to seek immediate medical treatment, and after J.L. was then left alone with mother, who may have coached her) that she first told mother about the sex abuse the day before mother took her to the hospital.

In the detention report, the social worker reported that she asked mother if mother believed Anthony P. could ensure J.L.'s safety, and that mother replied, "No. . . he is on his second strike [his] dad is a registered sex offender. . . . He was messing with little girls." At the jurisdiction hearing, mother testified the registered sex offender was

3

Darnell P.'s father, not Anthony's father, that he was "in prison doing a lot of time," and he was never around J.L.

Mother also told a social worker that Anthony P. and his girlfriend only wanted J.L. "for the food stamps and money," and she testified that was true at the jurisdiction hearing. She also reported that Anthony had kidnapped J.L. in 2011 and "[Anthony and his girlfriend] are trying to control me with my daughter." Mother also told the social worker that additional family members who cared for J.L. were gang associated and current abusers of narcotics but that she had not taken these facts into consideration in making the plan to leave J.L. in Anthony's home.

Mother's own criminal conduct began in 1991 when she was a juvenile and included vehicle theft and other property crimes. Mother told the social worker that she had been arrested four times in her life, but the social worker's investigation disclosed many convictions and incarcerations. As an adult, mother had numerous petty theft arrests and convictions. She received her first prison sentence for burglary when J.L. was 14 months old. There were several subsequent parole violations and prison sentences for petty theft, burglary, false impersonation of another, possession of forged notes, and a narcotics conviction. Mother used 11 different aliases, which may have contributed to the inconsistent information in the Department's reports concerning the number of her children: The social worker reported mother had 10 children, three of whom mother claimed as her own, who reside with their father in Texas, and six of whom mother denied are her children.

During her incarcerations, mother would leave J.L. with relatives, which led to previous child neglect referrals. On June 30, 2011, a San Bernardino social worker investigated a report that then five-year-old J.L. was outside without adult supervision. The social worker made her first face-to-face contact with J.L.'s maternal aunt, Leona W., about six weeks after the report. Leona said that mother had left J.L. with her for three years while mother was in and out of prison. This report of caretaker absence was deemed unfounded. A previous report of Leona's general neglect, when J.L. was four, and mother was incarcerated, was also deemed unfounded.

The petition in this case alleged under section 300, subdivisions (b) and (d) that mother knew about Darnell P.'s sexual abuse and failed to protect J.L.; and under subdivision (b) that mother made an inappropriate plan for J.L. by leaving her with Anthony P. who struck her with a belt and in whose home J.L. was sexually abused. The court dismissed the petition because the court believed mother's testimony that she had not anticipated the abuse when she made the plan to leave J.L. with Anthony; Darnell was now in prison so he was not an ongoing threat to J.L.; and J.L. would be better off with her mother than in foster care.

## DISCUSSION

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence. [Citations.] We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828.) " ' "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*Ibid.*)

In this case, we find no reasonable basis for the trial court's dismissal of the petition.

Section 355.1, subdivision (a) provides in pertinent part: "Where the court finds, based upon competent professional evidence, that an injury . . . sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." The parties and the court never questioned the truth or competency of the reports by medical professionals, the police and the Department social worker that J.L. had been raped regularly, many times, in Anthony's home, and that Anthony beat her when she complained to him of sex abuse -- injuries that J.L. suffered as a result of the manifestly unreasonable and neglectful acts and omissions of Anthony, in whose care mother had left J.L. for two years. The

5

Department's reports provided prima facie evidence that J.L. was a person described by subdivision (b) of section 300.

Mother's testimony at the jurisdiction hearing did not overcome the presumption that the sexual and physical abuse inflicted on J.L. in the home of Anthony P. was prima facie evidence that J.L. was a person described by subdivision (b) of section 300. At most, mother's testimony proved she did not know and had no reason to know that Darnell P. had raped J.L. until sometime in April 2013, shortly before she took J.L. to the hospital, and she did not know or have any reason to know that J.L. would be raped and physically abused in Anthony's home at the time she made the plan to leave J.L. in his care. But that evidence was completely beside the point. Whether or not mother knew or should have known of the abuse, and whether or not she failed to protect J.L. from the abuse, there is overwhelming and undisputed evidence to support the allegations in paragraph b-2 of the petition that in 2011, mother made an inappropriate plan to place J.L. in the care of Anthony, who physically abused J.L. by striking her with a belt, and in whose home J.L. was sexually abused by Darnell and the 13-year-old boy family friend, thereby endangering J.L.'s health and safety.

That the plan to leave J.L. with Anthony P. was inappropriate does not depend on whether mother knew or should have known that Darnell and the 13-year-old boy family friend would sexually abuse J.L. Mother admitted knowing many facts about Anthony that manifestly demonstrated J.L. would be at risk of harm in his home. Mother testified Anthony only wanted custody of J.L. "for the food stamps and money," that he had previously kidnapped J.L., and that he "used [J.L.] to control her." Mother told the social worker that additional family members who cared for J.L. were associated with gangs and abused narcotics, but mother did not take those facts into consideration when making the plan to leave J.L. in a home where J.L. would be in their presence. When the social worker asked mother if she believed Anthony could ensure J.L.'s safety in his home, she replied, "No. . . he is on his second strike [his] dad is a registered sex offender. . . . He was messing with little girls." Mother testified Anthony had two strike convictions for making terrorist threats to security personnel at a Walmart store, whom Anthony

6

threatened to enable his sister to get away with shoplifting from the store. And it matters not whether Anthony's father, or the father of his brother Darnell, was the registered sex offender who had molested little girls. It is undisputed that, when asked if mother believed Anthony could ensure J.L.'s safety in his home, one reason mother gave for answering "no" was that a family member had been convicted of molesting little girls. Mother's testimony that this family member was "in prison doing a lot of time," and the evidence that, by the time of the jurisdiction hearing, Darnell was in custody, is also utterly beside the point: The point is that considerable, substantial evidence proved mother made an inappropriate plan to leave J.L. with Anthony; *no evidence whatever* was offered to show the plan to leave J.L. with Anthony was appropriate; and while in Anthony's home, J.L. suffered serious physical harm as a result of Anthony's failure to adequately protect her.

Against this overwhelming weight of the statutory presumption and the Department's evidence, the trial court focused on the facts that mother testified truthfully, Darnell P. was in custody, and J.L. would be better off with mother than in foster care. No evidence whatsoever suggested that J.L. would be better off with mother than in foster care; no one suggested J.L. was not being well cared for in her foster placement; and, more to the point, J.L.'s placement pertains to disposition, not jurisdiction. And, as explained above, when considered in light of the record as a whole, the truthfulness of mother's testimony and the fact of Darnell's incarceration are insufficient to overcome the presumption that J.L. was at substantial risk of abuse or neglect. The trial court's findings are insufficient as a matter of law to overcome the presumption that J.L. is a child described by subdivision (b) of section 300.

We need not consider whether the court also should have sustained the petition allegations under section 300, subdivision (d). (*See In re Ashley B.* (2011) 202 Cal.App.4th 968, 979 ["As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate."]; *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127 ["[T]he juvenile court's jurisdiction may rest on a single ground."]; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 [where one basis for

7

jurisdiction supported by substantial evidence, court does not need to consider sufficiency of evidence to support other basis].)

## DISPOSITION

For the foregoing reasons, we reverse the trial court's order of May 15, 2013, and remand with instructions to issue a new order finding J.L. is a person described in section 300, subdivision (b).


GRIMES, J.

We concur:

RUBIN, Acting P. J.


FLIER, J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION EIGHT

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | B250566 |
| | (Los Angeles County Super. Ct. No. CK99291) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | **ORDER CERTIFYING OPINION FOR PUBLICATION, MODIFYING THE OPINION AND DENYING THE PETITION FOR REHEARING** |
| v. | |
| A.S., | **[NO CHANGE IN JUDGMENT]** |
| Defendant and Respondent; | |
| J.L., | |
| Appellant. | |

The opinion in the above-entitled matter filed on May 15, 2014, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

Also, this opinion is modified as follows:

On the last page, the following sentence is added to the end of the Disposition part: We express no opinion as to whether subsequent events might support a new and different order.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

_____

RUBIN, Acting P. J.             FLIER, J.             GRIMES, J.