Filed 12/3/21  In re K.N. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.N. et al., Persons Coming Under the Juvenile Court Law. | |
| | D079164 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. EJ4604) |
| Plaintiff and Respondent, | |
| v. | |
| I.N. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant I.N.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel for Plaintiff and Respondent.

INTRODUCTION

Five-month-old twin sisters, Z.N. and Za.N., were each diagnosed with broken blood vessels under the surface of the eye, or subconjunctival hemorrhages. The twins were under the sole care and supervision of their parents when the injuries presented, and their parents were unable to account for how the injuries occurred. A child abuse pediatrician determined that under these circumstances, the twins' injuries likely resulted from nonaccidental trauma and indicated a risk of more severe abuse in the future.

The juvenile court assumed jurisdiction over the twins and their three-year-old sibling and returned the children to the parents' home pursuant to a family maintenance plan. I.N. (Father) and S.M. (Mother) appeal from those orders, contending there was insufficient evidence to establish the twins suffered serious injury inflicted nonaccidentally by the parents, and as such, all three children's petitions should be dismissed. The parents also challenge the juvenile court's dispositional orders conditioning the children's placement in the parents' custody on their compliance with a family maintenance plan. Finding no error, we affirm the juvenile court's orders.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initiation of Dependency Proceedings and Detention*

Z.N. and Za.N. were born nine weeks premature.[1] They were hospitalized in the neonatal intensive care unit (NICU) because of their

---

[1]    " 'In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order.' " (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

premature birth. Upon release from the NICU, they began receiving physical therapy, occupational therapy, and other medical services. The twins' older sister, K.N., was also born premature and required early intervention services in physical therapy and speech therapy.

On the morning of February 6, 2021, Mother noticed a red dot in Z.N.'s eye. The redness worsened as the day went on, prompting the parents to bring her to the emergency room. The emergency room physician diagnosed her with a subconjunctival hemorrhage (SCH) to her right eye, and a "[v]ery mild" lateral conjunctival hemorrhage in the left eye. Z.N. did not present with other signs of injury, trauma, fractures, or bruising. She had no known allergies. Although forceful coughing or crying can cause an SCH, the doctor found these were unlikely explanations for Z.N.'s injury. Instead, the doctor suspected nonaccidental trauma and referred the case to the hospital's child protection team (CPT) for a physical abuse assessment.

A child abuse physician with the CPT, Dr. Nienow, confirmed that, absent a history of accidental trauma, Z.N.'s injury was "highly concerning" for physical abuse. Dr. Nienow described the injury as "sentinel," meaning a "seemingly minor injur[y] in non-mobile infants that [is] often [a] harbinger for future more serious abusive trauma." Dr. Nienow indicated that SCHs are generally not self-inflicted for children of Z.N.'s age and would not be caused by routine infant care or normal infant activity, such as eye rubbing, crying, vomiting, or sneezing. Noting that premature infants such as Z.N. and Za.N. are at a higher risk of abuse and neglect, Dr. Nienow recommended services be provided to support the family and to mitigate the risk of future harm.

After the San Diego County Health and Human Services Agency (Agency) was notified by the hospital of Z.N.'s injury, a social worker

interviewed the parents. Mother had no explanation for Z.N.'s injuries. She reported that Father was the children's primary caretaker, as she worked Monday through Friday from 8:00 a.m. to 5:00 p.m. and every other Saturday. Only the parents and the three children resided in the home. She denied anyone frequently visited the home or cared for the children, and the parents were especially cautious due to the COVID-19 pandemic. She indicated that older sister K.N. could not have caused the injury, since K.N. was not left alone with the twins. Mother also denied that Father could be responsible.

Father largely confirmed Mother's account during his interview with the social worker. As the children's primary caregiver, he denied that he or Mother would have injured Z.N. Father had researched Z.N.'s condition on the internet and thought the injury could have been caused by vomiting, crying, sneezing, or Z.N. grabbing her own eyes. When the social worker explained the doctor's conclusion that the injury was caused by someone pressing on Z.N.'s face or chest, Father denied this ever occurred while he was caring for the children. Father also noted the twins have three therapists who come to the home three times per week, and that the twins cry "a lot" around the therapists and he does not always supervise their visits. However, none of the therapists were in the home on February 5, the day before Z.N.'s injury presented.

The Agency attempted to safety plan with the parents, but the parents were unwilling to identify a support network or alternate placement options. Due to their lack of cooperation, the Agency took protective custody over the children and detained them in a foster home.

On February 10, 2021, the Agency filed a petition under Welfare and Institutions Code[2] section 300, subdivision (a) on behalf of Z.N., alleging there was a substantial risk she would suffer serious physical harm inflicted nonaccidentally. Pursuant to section 355.1,[3] the petition alleged Z.N. had suffered an SCH, a condition which would not ordinarily be sustained except as a result of the unreasonable acts of the child's parents. The Agency also filed petitions under section 300, subdivision (j) on behalf of Za.N. and K.N. based on the abuse of their sibling. At the detention hearing on February 11, the juvenile court appointed counsel for the parents and the children, detained the children out-of-home, and ordered the Agency to provide the parents with voluntary services. It further ordered supervised visitation for the parents.

Around this time, Za.N. was also diagnosed with an SCH in one eye. The foster parent noticed marks in the outside corner of Za.N.'s eye when the children arrived at the foster home on February 8, 2021. The twins' primary care provider examined Za.N. on February 10 and diagnosed her with an SCH in the right eye. This was the first time the primary care provider found an unexplained injury in either twin. When asked by the social worker if she believed the twins' injuries were nonaccidental, the primary care provider

---

[2]    All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3]    Section 355.1, subdivision (a) provides, in relevant part: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."

5

stated "the general teaching is that there is always concern when children of that age have injuries like that." After moving the children from the foster home to a children's center for a few days, the Agency placed the children with nonrelative extended family members.

Za.N. was referred to Dr. Nienow for further examination. Dr. Nienow agreed Za.N. had an SCH in one eye, and the presence of this injury confirmed her suspicions of physical abuse in the parents' home. Dr. Nienow opined that: "As with [Za.N.'s] sister, there has been no history provided to explain [Za.N.'s] injury. Subconjunctival hemorrhages are broken blood vessels under the surface of the eye and are the result of direct impact trauma to the globe itself, or more rarely secondary to increased intrathoracic pressure events. These are not the result of self-inflicted injury in this age group, are not caused by routine handling/care or crying/coughing/vomiting, nor are they sequela of prematurity or indicators of eye disease. In [the] absence of a reasonable accidental trauma history these findings are highly concerning for inflicted injury. It is very concerning that this is the second child in this family [who] has presented for this kind of trauma, further reinforcing the concern for physical abuse." K.N. was also examined and no injuries were identified.

At the parents' request, the twins' ophthalmologist, Dr. Robbins, provided letters to the Agency. Dr. Robbins had examined the twins for eye conditions following their premature birth, and determined their eyes were developing well as of their last exam in November 2020. Even though Dr. Robbins found the presence of Z.N.'s injury "alarming," she indicated there were many reasons why infants develop SCHs that are unrelated to abuse, such as coughing, sneezing, straining, rubbing, or hitting the eye. She stated that most SCHs in infants are caused by the infant hitting themselves in the

6

eye or accidentally being hit by a sibling. She also noted that a pediatric ophthalmologist had conducted a full dilated eye exam of Z.N. within 24 to 48 hours of her presenting with the injury, and no other pathology was found. Dr. Robbins described the parents as "devoted" and "caring," and she did not suspect any inappropriate behavior during her interactions with them.

On February 16, 2021, the Agency received a referral indicating that K.N. disclosed that Father hit her in the face. Mother confirmed that K.N. had made the same disclosure to her during a visit with the children on February 16, but both parents denied Father ever hit K.N. or used physical discipline. K.N. was examined and received a CT scan, but no injuries were noted. K.N. was also interviewed by the social worker but was unable to provide any details due to her difficulties communicating.[4]

During subsequent interviews with the social worker, the parents continued to lack an explanation for the twins' injuries. Mother maintained there was no abuse or neglect in the home and denied that she would benefit from services. During his interview, Father confirmed he was the children's primary caregiver and was currently unemployed. He denied ever leaving the children unsupervised. He stated he was usually present for the twins' in-home therapies, and K.N. was always supervised around the twins.

Dr. Nienow examined Z.N. and Za.N. during a follow-up appointment on February 22, 2021. Their SCHs had completely resolved, and there were no further injuries that indicated abuse or neglect. Dr. Nienow had reviewed the letters from Dr. Robbins but maintained that the twins' injuries were likely caused by physical abuse. Dr. Nienow noted that SCHs in infants are

---

[4]     Although Father initially indicated that K.N. was autistic, he subsequently claimed he had been misquoted and that she had not been diagnosed with autism.

"extraordinarily rare" and are the result of trauma in the majority of cases. She repeated her opinion that SCHs would not be, in this age group, the result of self-inflicted injury or routine infant care or normal infant activity.

Following Dr. Nienow's assessment of Za.N.'s injury, the Agency filed an amended petition on Za.N.'s behalf on March 5, 2021, alleging she was a child described by section 300, subdivision (a) and that the section 355.1 presumption applied.

Pending the jurisdiction and disposition hearing, Z.N. and Za.N. underwent bloodwork to determine if either child had a condition that may have contributed to their respective injuries. Their bloodwork came back normal, and no blood conditions were found. K.N. also participated in a forensic interview regarding her disclosure that Father hit her in the face. The allegation was deemed inconclusive due to K.N.'s inability to meaningfully participate in the interview. As for the parents, they had been successfully participating in Agency-approved parenting classes, but stopped attending child abuse group classes at some point and refused to resume participation unless it was court-ordered.

Dr. Nienow provided a final assessment regarding her findings on April 29, 2021. She noted that blood disorders in the twins had been ruled out as a cause. She also indicated that other evidence of abuse, such as bruising on the face or other areas, is not always seen in conjunction with eye hemorrhages if force was applied directly to the eye globe and not to other parts of the body. Additionally, there may not be additional injuries or bruising if smothering, strangulation, or suffocation was involved.

B.    *Contested Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing was held over the course of several days in May and June 2021. The Agency recommended that the juvenile court find the children's petitions true, continue to detain the

children out-of-home, and offer the parents family reunification services. It further recommended supervised visitation for the parents, with the Agency to have the discretion to lift supervision upon the parents' progress in the recommended services. In its reports, the Agency expressed concerns regarding the children's vulnerability given their young ages, complete reliance on their parents for protection, and developmental needs. In the Agency's view, the parents' failure to provide a plausible explanation for the twins' injuries indicated there was a continuing risk of future harm to all three children, which could increase in severity.

At the contested hearing, Mother called Dr. Robbins to testify, and she was designated as an expert in medicine and pediatric ophthalmology. Dr. Robbins examined the twins twice while they were in the NICU after their premature birth, and twice as outpatients in her office. According to Dr. Robbins, SCHs could occur for a variety of reasons, although they were uncommon in childhood generally, and were generally the most noticeable within the first 24 hours. In her opinion, the most common cause of an isolated SCH in infants was accidental trauma, such as a finger poke, and an infant of the twins' age possessed the ability to poke themselves in a manner that could cause an SCH. Dr. Robbins would not suspect child abuse absent additional injuries, and believed that a full eye exam would be necessary to accurately determine whether an SCH was caused by abuse. She testified, however, that abuse should be considered where the infant presents with an SCH and there is no accidental trauma history, and she agreed that SCHs can be a sentinel injury. She also agreed it was unusual that each twin suffered an SCH around the same time, which "heightened" the concern of nonaccidental trauma. She indicated that other than trauma, the second most likely cause of an SCH in infants was an infection, but this was a "far

second." Dr. Robbins was unable to provide any studies or data to support her opinions, and she indicated that she had only prepared to testify as a treating physician and not as an expert in child abuse.

Father called his own expert, Dr. Tawansy, who was also designated by the juvenile court as an expert in medicine and pediatric ophthalmology. In Dr. Tawansy's opinion, the twins' injuries were not related to child abuse but rather eye rubbing and eye inflammation caused by a viral infection. Dr. Tawansy agreed with Dr. Robbins that a child of the twins' age could self-inflict an SCH. He would also expect to see other physical injuries if an SCH had been caused by abuse, such as bruising or other injuries to the eye. Dr. Tawansy testified he had not personally examined the twins but formed his opinion that their injuries were caused by a virus based on the twins' medical records, information from the foster parents, and photographs of the twins. He noted the infants' eyes looked glazed and there was also evidence of eye secretions in the photographs, which indicated to him the existence of a viral infection. He believed that where child abuse is suspected, a comprehensive eye exam was "mandatory" to make an accurate diagnosis. During cross-examination, Dr. Tawansy admitted that his curriculum vitae was out of date and did not accurately reflect the hospitals where he had admitting privileges. He also admitted that he had been investigated by the California Medical Board for violating the standard of care, including combining syringes from different patients, and was in jeopardy of losing his surgeon certificate and his authority to supervise physicians. He ultimately settled the dispute.

The Agency called Dr. Nienow as its expert. Dr. Nienow testified that she evaluates around 1,500 children for suspected child abuse each year. Of those cases, she had determined only 50 percent were caused by abuse or

neglect, while the remaining 50 percent she determined were accidental or indeterminate causes.  Following this testimony, the juvenile court designated Dr. Nienow as an expert in pediatric child abuse.

Regarding the twins' injuries, Dr. Nienow testified in line with her earlier reports, maintaining that their injuries were most likely caused by some form of abuse.  Although not an ophthalmologist, Dr. Nienow completed a fellowship rotation in ophthalmology, and considered herself an authority on eye problems that were commonly presented in pediatrics, including SCHs.  She testified that SCHs were extraordinarily rare in normal, healthy infants, and were caused by direct trauma to the globe in most cases.  An SCH could be observed immediately and tended to darken during the first 24 hours.  According to Dr. Nienow, the most recent study conducted on nonambulatory infants with SCHs found 97 percent of the injuries to be related to nonaccidental trauma.  Dr. Nienow disagreed with the parents' experts that an infant of the twins' ages could produce enough force to cause their own SCHs.  She also did not believe that other markings were likely to be present if the twins' injuries were caused by abuse, noting that she had seen this before in other infants with SCHs who were abused.  She also discussed the potential that SCHs were caused by a virus, but found this unlikely, noting that the bloodwork for the twins did not indicate a viral infection, and the twins had not displayed any other signs or symptoms that would suggest a virus had contributed to their injuries.  She stated that Z.N. and Za.N.'s individual cases were peer-reviewed twice by seven other child abuse pediatricians, all of whom agreed with her conclusions.  Lastly, Dr. Nienow noted that prematurity was a significant risk factor for nonaccidental trauma generally, and premature infants were at twice the risk as their same-aged normative peers for abuse or neglect.

11

Two social workers were also called to testify regarding their reports and interactions with the family. The current social worker assigned to the children's cases testified that she believed all three children were at risk of abuse given their young ages and various developmental needs, the unexplained injuries in the twins, and the parents' lack of progress in child abuse classes. She expressed specific concerns about the Father's stress level as the children's primary caregiver. She also testified that Father was alone with the children on February 5, 2021, from 8:00 a.m. to 5:00 p.m. while Mother was at work, and he was also alone with Za.N. the following three days while Mother took the other two children to the hospital.

The juvenile court also heard testimony from one of the in-home infant educators for the twins, who had worked with the twins two hours each week for eight weeks. Although this educator did not suspect any abuse or neglect by the parents, she also did not believe that any of the service providers from her company could have caused the twins' injuries. The foster parent who first identified Za.N.'s injury testified she first noticed the injury on the evening of February 8, 2021, and that the injury was still observable the following morning. She did not observe either twin rub or itch their eyes or observe any signs of sickness in either twin.

The juvenile court also admitted into evidence the Agency's reports, the curriculum vitae for the medical experts, medical records documenting the twins' injuries, and a 45-second video taken by the children's current caregiver showing Za.N. putting her hands on her face and around her eyes. The court also admitted the medical articles that Dr. Nienow relied on in formulating her opinion, to determine whether the literature supported Dr. Nienow's opinion and not for the truth of the matter asserted in the articles.

After the close of evidence and closing arguments by counsel, the juvenile court addressed the credibility of the witnesses, starting with the medical experts. It found Dr. Nienow "highly credible," noting that she had testified in his courtroom before, while Dr. Robbins was also found to be "highly qualified" with "very impressive credentials." However, the court expressed reservations about Dr. Tawansy's credibility, noting that his failure to update his resume was "lazy," and that he gave opinions without sufficient evidence to support them. Lastly, the court found the current social worker and foster parent credible. As to the social worker, the court indicated that he had experience hearing testimony from her in his previous cases, and that her reports demonstrated that she is "competent" and "professional."

The juvenile court made a true finding on the petitions based on a preponderance of the evidence and assumed dependency jurisdiction over the children. The court concluded that the section 355.1 presumption applied and was unrebutted by competent evidence, finding no reasonable explanation for the twins' injuries outside of "just theories." The court disbelieved the testimony provided by the parents' experts, finding it unlikely that infants of the twins' age would injure their own eyes with the force necessary to create an SCH, and that none of the treating doctors noted any viral infections. The court expressly found that these were sentinel injuries, so although not life-threatening, the existence of the injuries raised the potential of future, more serious abuse. The court emphasized these injuries were uncommon for children of this age, noting the doctors who had treated the twins shared Dr. Nienow's concerns that the injuries were caused by child abuse. The court further noted that, even if the presumption was rebutted, it

13

would have still found the children's petitions true by a preponderance of the evidence.

The juvenile court then ordered the return of the children to their parents' care, conditioned on the parents' compliance with a family maintenance plan. In rejecting the Agency's request for out-of-home detention, the court found that detriment for removal had not been established by clear and convincing evidence. The court also expressed empathy for the parents' circumstance and the difficulties in caring for premature infants, finding "that anybody who may have had a moment of weakness or had a difficult time that potentially caused these injuries would not necessarily do them again." The court concluded that although the children could return to their parents' care, it was necessary to continue monitoring the parents under a family maintenance plan to ensure the children's safety. The safety plan required two adults to be present in the home at all times; all relatives and support persons who interacted with the family pursuant to the safety plan were to provide the Agency with general updates and any safety concerns; an assigned advocate would check on the family twice per month; and the Agency was authorized to conduct announced and unannounced visits. The parents were also ordered to participate in child abuse and group parenting courses, and Father was required to attend individual therapy if recommended by his child abuse group provider.

Father and Mother timely appealed.[5]

---

[5] Although Father and Mother have separately briefed this appeal, they have joined the arguments raised in each other's respective briefs.

DISCUSSION

On appeal, the parents contend the evidence before the juvenile court was insufficient to support the true findings for jurisdiction under section 300, subdivisions (a) and (j). They argue the testimony provided by their respective experts rebutted the section 355.1 presumption by which the subdivision (a) petitions were predicated, and that the evidence failed to show the twins suffered serious injury inflicted nonaccidentally by either parent. As such, K.N. was not an at-risk sibling under section 300, subdivision (j). They also assert the juvenile court abused its discretion by ordering their compliance with a family maintenance plan. They further contend that the juvenile court was biased against them.

As we shall explain, even if the statutory presumption was rebutted, there is substantial evidence in the record to support the juvenile court's jurisdictional findings. The parents' challenge to the dispositional orders is also unsuccessful because the family maintenance plan was tailored to address the best interests of the children and does not otherwise constitute an abuse of discretion. Lastly, the parents' accusations of judicial bias lack support in the record.

A. *The Juvenile Court's Jurisdictional Findings Are Supported by Substantial Evidence*

"The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.) Section 300, subdivision (a) authorizes the juvenile court to adjudge a minor a dependent child of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Subdivision (j) provides a basis for jurisdiction when a child's sibling has been abused or

15

neglected under section 300, subdivisions (a), (b), (d), (e), or (i), and there is a substantial risk the child will be abused or neglected, as defined in those subdivisions. (§ 300, subd. (j); *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 566.) The juvenile court need only find the allegations of the petition under the subdivisions of section 300 true by a preponderance of the evidence. (§ 355; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.)

In addition, under section 355.1, "[w]here the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).) The presumption created by section 355.1, subdivision (a), "constitutes a presumption affecting the burden of producing evidence." (§ 355.1, subd. (c).) Once the Agency establishes a prima facie case under section 355.1, the burden of producing evidence "merely shifts to the parents the obligation of raising an issue as to the actual cause of the injury or the fitness of the home." (*In re James B.* (1985) 166 Cal.App.3d 934, 937, fn. 2 (*James B.*) [discussing former section 355.2, section 355.1's predecessor].)

"The general rule is that 'the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition.'" (*In re M.R.* (2017) 7 Cal.App.5th 886, 896.) Under this standard, we consider the entire record to determine whether the evidence is " ' "reasonable, credible, and of solid value." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) We do not pass on the credibility of witnesses, attempt to resolve conflicts in the

evidence, or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's orders, and affirm the orders even if other evidence supports a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 (*Casey D.*) disapproved of on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 635–636.) Substantial evidence is not synonymous with any evidence. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 (*Savannah M.*), abrogated on different grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628–631.) The ultimate test is whether, considering the entire record, a reasonable trier of fact would make the challenged ruling. (*Savannah M.*, at pp. 1393–1394.)

We begin our analysis with the statutory presumption set forth by section 355.1, subdivision (a). As noted, that presumption is only a presumption affecting the burden of producing evidence. (§ 355.1, subd. (c).) " 'The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' (Evid. Code, § 604.)" (*In re D.P.* (2014) 225 Cal.App.4th 898, 903–904 (*In re D.P.*).) "Thus, when the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor it initially worked to prove the fact in question." (*Rancho Santa Fe Pharmacy, Inc. v. Seyfert* (1990) 219 Cal.App.3d 875, 882.) In comparison, a presumption affecting the burden of proof imposes a much more onerous burden, placing the burden on the opposing party to disprove the presumed

17

fact by a preponderance of the evidence (or other appropriate standard). (Evid. Code, § 606; *In re Heather B.* (1992) 9 Cal.App.4th 535, 560–561.)

In this case, we assume without deciding that the parents' expert testimony—opining that the twins' injuries were most likely unrelated to abuse—was sufficient to rebut the statutory presumption under section 355.1. (Cf. *In re Quentin H.* (2014) 230 Cal.App.4th 608, 615 [evidence in the record showing father had always behaved appropriately with his children was sufficient to rebut the section 355.1 presumption that his children were described by section 300, subdivisions. (b) and (d)]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1041 [father rebutted the section 355.1 presumption with contradictory evidence in social worker's report regarding the physical cause of the child's injury]; *James B.*, *supra*, 166 Cal.App.3d at p. 937 [discussing section 355.2, section 355.1's predecessor, and concluding the juvenile court erred by applying the statutory presumption where the parents had presented rebuttal evidence, which included expert testimony indicating that the child's injuries could have been caused accidentally]; with *In re J.L.* (2014) 226 Cal.App.4th 1429, 1433–1435 [presumption under section 355.1 applied where mother's testimony that she did not know or have any reason to know of her child's abuse was "completely beside the point" to disproving the allegations in the petition]; *In re Richard H.* (1991) 234 Cal.App.3d 1351, 1363 [expert testimony indicating that child's injuries were nonaccidental established a section 355.1 presumption, which was not rebutted by the parents].)

However, even without applying the statutory presumption, we conclude there is substantial evidence in the record to support the juvenile

18

court's jurisdictional findings.[6]  Although the court found Dr. Robbins and Dr. Tawansy to be qualified experts in pediatric ophthalmology, it concluded that Dr. Nienow provided the most persuasive testimony on the issue of abuse.  Dr. Nienow, who the juvenile court certified as an expert in child abuse pediatrics, reported that SCHs were extraordinarily rare in normal, healthy infants, occurring in only 0.5 percent of that population.  She testified that in the most recent study conducted on infants presenting with SCHs, 97 percent of the SCHs were found to be related to nonaccidental trauma.  She also explained that other causes unrelated to abuse had been ruled out, as the twins presented with no symptoms of upper respiratory illness, no history of illness or underlying medical condition, and no history of accidental trauma was provided by the parents.  Dr. Nienow further testified that of the 1,500 child abuse cases she evaluates each year, she determined child abuse was the cause of the child's condition in only 50 percent of those cases.

Dr. Nienow's conclusion that abuse was the most likely explanation for the twins' injuries was not an isolated opinion, as numerous other doctors shared her concerns that the twins' injuries were inflicted intentionally.  For instance, Dr. Nienow's opinion was peer-reviewed twice by seven other child abuse pediatricians, all of whom agreed with Dr. Nienow that abuse was the most likely explanation.  The twins' primary care provider also stated that the circumstances of the twins' injuries were concerning for abuse.  And even before Dr. Nienow became involved in the case, the emergency room physician who examined Z.N. suspected nonaccidental trauma.

---

[6]    The juvenile court expressly noted that, even if the presumption was rebutted, it would have still found the children's petitions true by a preponderance of the evidence.

Further, although Dr. Robbins differed with Dr. Nienow's ultimate findings, she agreed with Dr. Nienow's opinion in significant respects. For instance, she conceded it was "odd" both twins had the same injury absent any underlying conditions. Additionally, it was her opinion that trauma, such as a finger poke, is the most common cause of an SCH, while SCHs caused by infections are much rarer. Even though Dr. Robbins believed that the most common cause of an isolated SCH was accidental trauma, she admitted SCHs could constitute a sentinel injury, and that nonaccidental trauma could still be considered as a potential cause in this instance.

The parents raise various contentions to challenge the juvenile court's reliance on Dr. Nienow's testimony, asserting that the testimony provided by their respective experts should have been given greater weight. For example, they contend that Dr. Nienow's opinion was unpersuasive because she is not an ophthalmologist. They also challenge the validity of the reports Dr. Nienow relied on in formulating her opinion. But these challenges overlook the governing standard of review, as we do not reweigh the credibility of witnesses or the evidence and we are required to affirm the orders even if other evidence supports a contrary finding. (See *Casey D.*, *supra*, 70 Cal.App.4th at pp. 52–53 [Under the substantial evidence standard, "[w]e have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence."].)

The juvenile court was entitled to discount the testimony provided by Dr. Robbins and Dr. Tawansy and find that Dr. Nienow's conclusions were the only reasonable explanation of what caused the twins' injuries. Moreover, the court reasonably questioned the veracity of Dr. Tawansy's

testimony; he made a diagnosis of a viral infection in the twins based on pictures and blood tests. He never personally examined the twins, and the court correctly noted that none of the treating doctors noted any viral infections. The court was permitted to rely on the totality of this evidence in determining the probative value of Dr. Tawansy's testimony, and we lack the authority to supplant the court's credibility determinations with our own. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1451–1452.)

We are similarly unpersuaded by the parents' contentions that the juvenile court's section 300, subdivision (a) findings are legally flawed. They assert, for instance, that the court's finding that the twins' injuries were "sentinel" and therefore relatively minor demonstrates that the twins did not fall within the definition of section 300, subdivision (a). Under that subdivision, "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) Even though the court found the injuries were sentinel, it was appropriately concerned that both twins presented with the same injury. The circumstances of Za.N. and Z.N.'s injuries therefore fell directly within the definition of section 300, subdivision (a), as there was a "history of repeated inflictions of injuries on the child *or the child's siblings*[.]" (Italics added.)

Contrary to the parents' contentions, there were additional factors in this case indicating that the twins were vulnerable to suffering from future, more serious abuse, which provides further support for sustaining the petitions under section 300, subdivision (a). For instance, it is undisputed that the twins' injuries likely occurred while under their parents' supervision.

21

According to Dr. Robbins and Dr. Nienow, the twins' SCHs would have been visible within the first 24 hours, and the twins were in the parents' exclusive care during the 24 hours leading up to the discovery of the injuries. While Dr. Robbins suggested an SCH could be caused by an older sibling accidentally, both parents maintained that K.N. was never left alone with the twins. Dr. Nienow also provided uncontroverted testimony that premature infants generally are more susceptible to abuse.

The parents also focus on the lack of a definitive cause for the twins' injuries, suggesting that such circumstances are insufficient for a jurisdictional finding under section 300, subdivision (a). However, appellate courts have determined that allegations under section 300 may be sustained even if the cause of the child's injuries is unknown. (See, e.g., *In re A.S.* (2011) 202 Cal.App.4th 237, 245–246 (*In re A.S.*) [where the parents could not be ruled out as perpetrators for the child's injuries, a finding of jurisdiction under section 300, subdivision (b), was proper], disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989; *In re Christina T.* (1986) 184 Cal.App.3d 630, 640 [jurisdiction under section 300, subdivisions (a) and (d), was supported when it could not be ascertained whether the father or mother's boyfriend sexually abused the child]; *In re E.H.* (2003) 108 Cal.App.4th 659, 670 ["where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out"].) As the court in *In re A.S.* explained: " 'Unlike criminal proceedings, where establishing the identity of the perpetrator is paramount, the purpose of dependency proceedings [is] to fashion appropriate orders in the best interest of the child. . . .' [Citation.] If a perpetrator's identity must be conclusively established, 'a family could stonewall the [social services department] and its social workers concerning the origin of a child's injuries

and escape a jurisdictional finding. . . .' [Citation.] The prerequisite of a conclusive identification could lead to absurd results: the potential return of a seriously injured child to an unidentified perpetrator. The purpose of dependency law 'is to provide maximum safety and protection' for currently abused and neglected children and to ensure the safety of children at risk of harm." (*In re A.S.*, at pp. 245–246.)

At the time of the contested adjudication, the parents could not be ruled out as the perpetrators of the twins' injuries. As explained *ante*, the twins were under their parents' exclusive care when the injuries presented, and multiple medical professionals agreed that the absence of any explanation for the injuries suggested nonaccidental trauma. Such evidence supports a reasonable inference that the twins were at a substantial risk of serious physical harm and was sufficient to sustain the jurisdictional findings under section 300, subdivision (a). (See *In re D.P.*, *supra*, 225 Cal.App.4th at p. 903 ["The undisputed evidence of nonaccidental trauma and mother's failure to explain how [her minor son] was injured in her care constituted substantial evidence that mother was responsible for inflicting these injuries on [the minor]."].)

The parents also highlight statements made by the juvenile court when ruling on disposition, which they argue could suggest there was no longer a risk of future harm. In this section of its ruling, the court noted that the parents were hardworking, loved their children, and that having "a really bad moment . . . doesn't make you a really bad person." The court also stated that although the abuse may have occurred in "a moment of weakness," this did not necessarily mean it would happen again. The parents deduce that these dispositional findings indicated there was no substantial danger to the children's well-being and were therefore inconsistent with the court's

23

jurisdictional findings that the children were at substantial risk of serious harm.

None of the statements the parents emphasize, however, are necessarily inconsistent with the juvenile court's jurisdictional findings. While jurisdictional findings require only a preponderance of the evidence (§§ 300, 355, subd. (a)), a dependent child may not be taken from the physical custody of the parent under section 361 at the dispositional stage unless the court finds there is clear and convincing evidence of a substantial danger to the child's well-being if returned home, and there are no reasonable means to protect the child's physical health without removing the child (§ 361, subd. (c)(1)). The court in this case expressly found that although the evidence was sufficient to establish jurisdiction by a preponderance of the evidence, it did not find clear and convincing evidence to justify the children's continued removal from the home. Rather than establishing an inconsistency, these findings reflect the court's compliance with the heightened burden of proof required for establishing disposition relative to jurisdiction.

As we have explained, there is substantial evidence in the record to support the juvenile court's jurisdictional findings under section 300, subdivision (a). Correspondingly, the court's assumption of jurisdiction over K.N. pursuant to section 300, subdivision (j) is also supported. Under section 300, subdivision (j), "[t]he court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is substantial risk to the child." In this case, the Agency was unable to confirm K.N.'s allegation that Father hit her in the face. However, "[t]he juvenile court need not wait until a child is seriously

24

injured to assume jurisdiction if there is evidence that the child is at risk of future harm from the parent's negligent conduct." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.) In the absence of any confirmed injuries to K.N., the court could still reasonably conclude that the unexplained injuries to K.N.'s siblings placed her at a substantial risk. K.N. was similarly situated to the twins given her young age, complete reliance on her parents for care, and her own developmental needs. Further, K.N.'s difficulties communicating with the social workers throughout these proceedings indicated she may be unable to report abuse. Thus, the similarities in the circumstances of these siblings are sufficient to sustain the jurisdictional allegations in K.N.'s petition.

B.      *The Juvenile Court Did Not Abuse Its Discretion in Ordering Family Maintenance Services*

After the juvenile court makes a true finding at the jurisdictional phase of a dependency case, the court must then consider whether a minor should be declared a dependent and whether he or she would be at substantial risk of harm if not removed from the parent's care. (§§ 358, subd. (a), 360, 361; see *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129.) In general, " '[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.' " (*In re Neil D.* (2007) 155 Cal.App.4th 219, 225.) The juvenile court's order " 'will not be reversed absent a clear abuse of discretion.' " (*Ibid.*)

In challenging the dispositional orders, the parents assert that the juvenile court impliedly found that the abuse "was a one-time event, and that it would not happen again." They highlight statements the court made complimenting the parents for being hardworking and loving their children, and the court's indication that there was not "necessarily a propensity" for further abuse. Based on these comments, combined with the court's decision

25

to return the children to the parents' care, the parents assert that their continued supervision under a court-ordered family maintenance plan is arbitrary.

The parents' challenge to the juvenile court's dispositional findings, however, takes the court's statements out of context. The court did not find that the abuse was a "one-time event." Rather, it was optimistic that the children could safely return to the parents' care but believed that a family maintenance plan was necessary to ensure there were no further instances of abuse. The court also cited the appropriate legal standards throughout its decision, and as explained previously, the dispositional and jurisdictional findings reflected the Agency's differing burdens of proof. (§§ 300, 355, subd. (a), 361, subd. (c)(1).) Thus, sustaining the jurisdictional allegations while also returning the children to the parents' care was neither arbitrary nor inherently inconsistent.

The specific aspects of the family maintenance plan further demonstrate that the juvenile court acted within its discretion when it made its dispositional orders. For instance, the family maintenance plan included the requirement that two adults be present in the home with the children at all times, and that the parents attend child abuse classes. Both provisions specifically addressed concerns the Agency raised regarding Father's stress level as the sole caregiver for the children while Mother is at work, and the parents' refusal to attend child abuses classes unless it was court-ordered. Overall, the court was entitled to fashion its dispositional orders in the manner it determined would serve the children's best interests, and requiring the parents to comply with a family maintenance plan does not constitute an abuse of discretion under the circumstances of this case. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

C.	*The Juvenile Court Was Not Biased Against the Parents*

The Due Process Clause " 'entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.' " (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 673.)  That right extends not only to criminal defendants but to civil litigants as well.  (*People v. Scott* (1997) 15 Cal.4th 1188, 1206.)  However, as the California Supreme Court has explained, "[m]ere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111 (*Guerra*), overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

On appeal, our task is to "assess whether any judicial misconduct or bias was so prejudicial that it deprived [the appellant] of ' "a fair, as opposed to a perfect, trial." ' " (*Guerra*, *supra*, 37 Cal.4th at p. 1112.)  This standard is "an objective one," and it requires a showing of bias on the part of the trial judge that is so great as to become " ' "constitutionally intolerable." ' " (*People v. Freeman* (2010) 47 Cal.4th 993, 1001.)

The parents' assertion that the juvenile court was biased against them relies on comments the judge made indicating his familiarity with Dr. Nienow and one of the social workers who testified in this matter.  The parents contend that rather than basing its credibility determinations on the testimony presented at trial, the court had predetermined the credibility of these witnesses.

We perceive no judicial bias in our review of the record.  For instance, in finding that Dr. Nienow was credible, the juvenile court expressly referred to the testimony Dr. Nienow provided in this matter to support the present petitions.  The court was particularly persuaded by her testimony that she

27

finds child abuse in only about half of the cases she reviews. Similarly, the court made a positive credibility finding of the social worker based on her "work product," indicating that the court had relied on the quality of the reports the social worker provided in these proceedings. Thus, although there were passing references to the court's prior cases that involved these witnesses, the credibility determinations were rooted in the evidence presented in this matter.[7]

The record is otherwise replete with examples showing that the juvenile court treated the parties fairly and even-handedly, and with empathy. For instance, the court rejected the Agency's request for out-of-home detention, instead allowing the children to return to the parents' care. In making these dispositional findings, the court described the parents as "very good people," "hardworking," and that they appeared to love their children—compliments the parents have expressly recognized in this appeal. Even though the court ultimately found the Agency's evidence more persuasive as to the jurisdictional allegations, the court also found Mother's expert, Dr. Robbins, to be "a very highly qualified witness" with "very impressive credentials" in her own right. (Cf. *Guerra*, *supra*, 37 Cal.4th at p. 112 ["a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias"].) This record, on the whole, does not support the parents' claims of judicial bias.

---

[7] We note that the juvenile court's stray remarks regarding its prior experiences with these witnesses were unnecessary to the court's ultimate findings in this case, and thus it may have been preferrable for the court to refrain from such commentary. Nevertheless, "[t]he role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid.' [Citation]." (*People v. Harris* (2005) 37 Cal.4th 310, 347.)

## DISPOSITION

The orders of the juvenile court are affirmed.

DO, J.

WE CONCUR:

IRION, Acting P. J.

GUERRERO, J.