Filed 2/1/24  In re L.J. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re L.J., a Person Coming Under the Juvenile Court Law. | B324863 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.J. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. 22CCJP01883A) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Jean M. Nelson, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant M.J.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant S.B.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

————————————

M.J. (Mother) challenges the jurisdictional findings and dispositional orders concerning her daughter L.J., while S.B. (Father) appeals the order removing L.J. from his custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Initial Investigation and Dependency Petition*

L.J., born in 2015, came to the attention of the Department of Children and Family Services (DCFS) on May 2, 2022, when Father left L.J. with her maternal grandfather and maternal step-grandmother (collectively, maternal grandparents), without warning and without clothing, money, or food. On or about May 4, 2022, Father had a violent crisis at the home of the paternal grandmother. Police found him nude under a blanket, and covered with rubbing alcohol and printer ink; he appeared to have been eating the ink and drinking the alcohol. He shattered windows, threw items out of a window, and attempted to throw the paternal grandmother out of a window. Father was uncooperative with the police and resisted arrest. He was taken to a hospital on a psychiatric hold under Welfare and Institutions Code[1] section 5150.

On May 5, 2022, Father entered an inpatient recovery center. Father claimed he was not manic, he did not have mental health issues, and he was not taking medication; however, he had experienced a substance abuse issue for some time. He said he had been using drugs since "well before" he was a teenager. Father had used marijuana and alcohol as a teenager, and for the

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

past six months he had been using methamphetamine. He said his family was aware of his drug use.

Father reported he had had custody of L.J. for two years. He acknowledged repeatedly taking L.J. to the maternal grandparents and then taking her back, saying he was making up his mind what to do. He said he now knew it was best for the maternal grandparents to take care of L.J., and he was in the process of giving them custody of her through the courts. Father said that whether or not he was using substances, and even when he left his rehabilitation program, he wanted L.J. to stay with the maternal grandparents, as it was in her best interest.

The maternal step-grandmother reported this was not the first time Father had left L.J. with them. In October 2020, Father brought L.J. to stay the night with them and then he extended her stay. They did not hear from him again until Easter 2021, when he returned, took L.J. out of school, and terminated her counseling. According to the maternal step-grandmother, L.J. was an "emotional mess" because Father drops her off and then returns whenever he feels like it.

According to the maternal step-grandmother, on April 25, 2022, Father gave L.J. to them with a signed letter giving them guardianship of her. But on the morning of April 27, 2022, L.J.'s first day of school, Father wanted her back. According to the maternal step-grandmother, they persuaded Father to let her go to school, but the next day, Father rang their doorbell at 5:30 a.m. and demanded L.J. This was not unusual for Father, who continued this back and forth over the next several days.

The maternal step-grandmother said Mother had admitted she and Father used to use drugs together as teenagers; they ordered synthetic drugs online. The maternal step-grandmother

3

said Mother was addicted to pills and alcohol, and she telephoned a year ago to say she had overdosed.

On May 5, 2022, L.J. told DCFS she had last seen Mother in person two years earlier and that Mother did not call her very often. L.J. said she went back and forth between her maternal grandparents and Father. L.J. said she knew Father drank alcohol because there was a plastic bag filled with metal bottles in his room. She said she saw Father and a person she knew as his "broman" drinking something they said was illegal. Father drank two bottles and his friend drank four.

L.J. said Father acted weird sometimes. He would put his chin down and start to get "big eyes." When he had big eyes, he argued with everyone, and her paternal grandmother would call on her paternal grandfather to handle Father. Sometimes big eyes lasted for two straight days. This happened monthly. L.J. said she always knew when Father was going to take her to the maternal grandparents because he had big eyes. By the time they made the long drive to the maternal grandparents' home, Father would not have big eyes anymore.

On May 5, 2022, the maternal grandfather told DCFS he no longer spoke to Mother, who was an addict. He said Father had been around since Mother was 14, and Mother and Father used drugs together when Mother was a teenager. The maternal grandfather did not believe Father could care for L.J. and expressed concern about the effect on her of Father constantly moving her back and forth.

On May 6, 2022, Father told DCFS that he received full custody of L.J. after Mother's boyfriend abused L.J. in 2019. L.J. and Mother had supervised visits by telephone, but according to Father, Mother put in little effort and sometimes said she was

4

busy at work when they called.  Father did not know if Mother was currently sober.

Father disputed L.J.'s report that the paternal grandfather had to come over to handle him, stating that this only happened once because he was "getting high on Noz" from balloons.  Father said that "Noz" is "not a big thing, practically not illegal, because someone would actually need to see you puffing from the balloon."

Father said he had abused marijuana and alcohol as a teenager, he had used the worst drugs, and he had hurt his family.  He wanted to stop using drugs and was ready for rehabilitation, which would take two months.

On May 10, 2022, Mother told DCFS she started dating Father when she was 11 years old, and she was 16 or 17 years old when L.J. was born.  Mother said she began to use drugs at age 14 when Father put a chemical he ordered online into her tea, and after she stopped drinking Father's tea she started smoking "spice."

Mother said she began experiencing post-traumatic stress disorder (PTSD) in 2019 when her children were removed from her custody.  Mother said she became homeless and began using drugs in 2020.  Her drug of choice was heroin.  Mother stated she moved to North Dakota to try to stop using drugs; she chose North Dakota because her biological mother, an "extreme alcoholic," was there.  According to Mother, in April 2021 she overdosed and "died for five minutes" before being revived, and since then she had been sober.  She said she was taking classes and obtaining outpatient care.

Mother reported childhood trauma, including sexual abuse and physical abuse by relatives.  She said she was seeing a psychiatrist and taking prescription medication nightly for her

5

severe PTSD and anxiety. Mother was not seeing a therapist; she did not like therapy.

Mother had failed to reunify with another child, L.J.'s half-sibling. She claimed not to know why they had not reunified, as she had completed all her classes and had the certificates to prove it. She said "they" wanted her to have a psychological evaluation, which she did not do.

Mother felt L.J. would be better off living with her than with the maternal grandparents and said L.J. wanted to live with her. Mother said she had learned a lot from parenting classes, and she could be present for L.J. emotionally, physically, and financially. She had a better relationship with L.J. now. When the social worker said Mother was reported to have minimal contact with L.J., Mother claimed she called "all the time" to talk to L.J. but Father did not answer her calls.

Mother described Father and the maternal grandparents as a "terrible fucking bunch." She alleged the maternal step-grandmother used pills. She claimed the maternal grandfather had Mother hospitalized for cutting and self-harm in 2016 and then tried to keep L.J. Mother believed Father was selling drugs on an online auction website. She said Father filed a false report alleging physical abuse against her (now ex-)boyfriend in 2019. Mother alleged Father had physically, sexually, and verbally abused L.J. Mother thought Father was psychotic and possibly schizophrenic; he heard voices telling him the paternal great-grandmother was evil and possessed. She said for a time Father and L.J. were living in a tent and washing their clothes with a water hose. Mother claimed from 2017 to 2019, she repeatedly tried to take Father to court due to her concerns, but each time she was denied.

As for Father's family, Mother alleged the paternal grandfather was a severe alcoholic and the paternal great-grandfather had sexually abused a child.

On May 16, 2022, DCFS filed a petition under section 300, subdivision (b)(1), alleging that (1) Father had a history of substance abuse and currently abused methamphetamine, nitrous oxide, alcohol, and illicit substances, rendering him unable to provide regular supervision to L.J., and Mother failed to protect L.J. from Father's substance abuse; (2) Mother had a history of substance abuse, including heroin and prescription medication, which rendered her unable to provide regular care and supervision to L.J.; (3) Father had mental and emotional problems, including erratic and aggressive behaviors, that endangered L.J.; and (4) Mother had mental and emotional problems, including PTSD, anxiety, and self-harming behavior; she had been hospitalized for mental health issues and had refused to seek mental health treatment; and her mental health issues rendered her incapable of providing L.J. with regular care and supervision and placed L.J. at risk of serious physical harm.

II.    *Pre-Adjudication Investigation*

On June 27, 2022, Mother told DCFS that the allegations against her were false and she was not happy that her history was being used against her. Mother said she had struggled with mental health issues since she was 13 years old, when she was diagnosed with bipolar disorder, anxiety, and depression. She had been in counseling and on psychiatric medication since she was a child, and she had taken a number of different psychoactive medications. According to Mother, she had been hospitalized for psychiatric issues at the ages of 13 and 16 and she blamed Father for her hospitalizations, saying he made false

7

reports. Mother said she had engaged in self-harming behavior when she was 18 years old but no longer.

Mother denied psychiatric hospitalizations as an adult and said she had "been emotionally stable for a long time now." Mother said her current diagnoses were severe PTSD, anxiety, and depression. She was taking three medications under the supervision of a psychiatrist and her primary care physician, and she followed her medication regimen. She was considering hypnotherapy to address her trauma and was "looking into connecting" with a mental health provider for counseling.

Mother maintained she was sober and capable of providing care and supervision to L.J. Mother reported that in high school, she and Father took experimental drugs. She denied they used "hard core" drugs. Mother said she had been prescribed opiates for spinal pain in 2018. She had not been overusing them, but when DCFS got involved and removed the children, "things went downhill." Mother said she "turned to drugs," and began using other drugs "to stop feeling shitty." She admitted using heroin and opiates but said she had been sober for more than one year. According to Mother, on April 18, 2021, two days after she moved to North Dakota, she overdosed on heroin and "died for 10 minutes" before being revived. She had been sober since. When asked if she had attended any program to get sober, Mother said no; she quit on her own. Mother said she attended Alcoholics Anonymous meetings weekly. She told DCFS she was willing to drug test and she planned on starting substance abuse counseling "soon."

Mother reported that when she was a teenager, Father had a severe drug problem. He used chemicals he ordered online, and she took them too. Mother claimed she reported Father's

8

substance abuse issues to DCFS, but DCFS did nothing. Mother said Father had always had mental problems and he had a very bad anger problem, and she had always been "screaming about this" to DCFS.

Mother said she lived alone in North Dakota near her biological mother, but they did not get along due to her mother's alcoholism. Mother said she had no support system; the only person who had supported her was her grandmother, who died in 2020. Mother did not undergo grief therapy when her grandmother died but told DCFS she had done "lots of therapy" throughout her life.

On June 27, 2022, DCFS spoke with Father, who said he had been in his recovery program for seven weeks and would be discharged in July 2022. Father said he was there voluntarily and was taking parenting, anger management, and domestic violence classes. He drug tested weekly and all tests had been negative. Father said he joined the rehabilitation program prophylactically, to avoid any similar situations in the future. He felt he needed professional help to get a better sense of who he is and to develop coping skills. He said he was taking his classes and recovery seriously and wanted to reunify with L.J. Father intended to stay away from all substances, including marijuana and alcohol, when he left the program.

Father said that throughout his life he had used marijuana and alcohol socially, once or twice per month. He disputed whether nitrous oxide should be considered a drug. Father denied he was a methamphetamine abuser, contending he only used it once, under peer pressure, on May 5, 2022. Father said the methamphetamine made him anxious and panicky; he was yelling and felt like he was going to have a heart attack. At his

request his mother called 911 because he "wasn't feeling well." At the hospital he was given medication and slept; when he woke up he felt better and asked to be referred to treatment. However, Father said he did not have a substance abuse problem, he denied needing substance abuse treatment, and he said he went to treatment "to prevent [himself] from getting into something else later."

Father denied knowing whether he was placed on a psychiatric hold when hospitalized and said he had no prior record of psychiatric hospitalizations. Father denied any ongoing mental health issues and claimed not to understand how the mental health allegation in the petition related to him. He said, "I was panicking. I just didn't feel good. I didn't react well to the [methamphetamine]. I've never had any other outbreaks. I don't see the mental aggressive past. The only incident has been on 5/5/22. Besides that, I've been a good person. I go to school, I go to work. I am not an addict. I used something that didn't react well with me."

Father said when he met Mother she used to cut herself. When they were together, Mother told him she was schizophrenic and bipolar and was taking medication. Father thought Mother had PTSD and believed she took Xanax for anxiety.

Father told DCFS that when L.J. was three years old DCFS became involved with the family because Mother's boyfriend physically abused L.J. Mother did not complete her court-ordered classes and did not leave her boyfriend, and Father was granted physical custody of L.J. He said Mother moved to North Dakota one month later.

Father's case manager confirmed his participation in programs, negative drug tests, and anticipated program completion date.

The maternal grandparents told DCFS they had known Father for more than seven years, and they knew about his substance abuse problems. The maternal grandfather said Mother had been an addict for many years, although he was not sure how she was doing presently. The maternal grandfather reported that Mother's biological mother, an alcoholic, was Mother's only support in North Dakota.

In a July 6, 2022 conversation with DCFS, L.J. said she did not want to live with Father because he was often angry at her. She said she had seen Father drink alcohol, and after drinking, he "acts crazy, like scratching people and fighting people." L.J. reported Father had not scratched her but he had scratched the paternal grandparents. According to L.J., one day she saw alcohol in Father's room; Father then began to act crazy and scratched his parents. L.J. stayed with her paternal grandfather for six months because Father "was still acting crazy."

L.J. told DCFS that on her seventh birthday, Father called her by Mother's name and refused to believe her when she said who she was. When the paternal grandmother came to pick up L.J., Father refused and said they would stay in the car. He also called the paternal grandmother by Mother's name.

L.J. said she did not know much about Mother's mental health but that things seemed okay when she spoke to Mother on the phone. L.J. did not know if Mother abused substances, but noted that during phone visits Mother did not "act crazy like [D]ad." L.J. told DCFS Mother did not scare or upset her like Father did.

11

DCFS reported the family had a prior dependency case in 2019. The case arose from a substantiated referral alleging that Mother's boyfriend abused L.J., Mother neglected L.J. and L.J.'s half-sibling, and Mother and her boyfriend engaged in physical altercations in L.J.'s presence. According to the referral, Mother did not believe L.J.'s report of abuse and denied her boyfriend had abused L.J. even after being informed she had bruises suggesting child abuse. Mother was unwilling to leave her boyfriend.

Mother claimed the earlier dependency case began when she was accused of physically abusing L.J., but then, when DCFS realized that L.J. had been bruised while in Father's care, DCFS "switched the issue" to Mother's psychiatric problems. She claimed Father made a false allegation of physical abuse against her boyfriend and that Father had physically, sexually, and verbally abused L.J.

In the prior case the juvenile court found true allegations that the boyfriend physically abused L.J., Mother knew or reasonably should have known about the abuse and failed to protect L.J., Mother had a history of exposing L.J. to acts of domestic violence with her boyfriend, and Mother had "an untreated mental illness which impairs her ability to provide adequate care and supervision for the child, [L.J.], in that [Mother] has been diagnosed with schizophrenia and is not compliant with her medication regimen." Ultimately, the court terminated jurisdiction over L.J. and issued a juvenile custody order giving Father sole physical and joint legal custody of L.J. Mother said she had complied with court orders, but the court's order restricted her to supervised visits because she did not

complete individual counseling, parenting classes, and a domestic violence program for offenders.

Mother confirmed the dependency case involving L.J.'s half-sibling was based on the "same reasons and same report." Mother said she lost custody of this child because she had not left her boyfriend, but Father said she failed to reunify because she did not follow through on her programs. L.J.'s half-sibling was placed with the maternal grandparents, who were adopting her.

DCFS concluded both parents had ongoing unresolved issues and lengthy histories of substance abuse and mental health problems. DCFS did not believe Father had gained insight into his issues during his 60-day treatment program and noted that his substance abuse problems appeared to have contributed to his mental health problems, as evidenced by his recent hospitalization. DCFS wanted Father to take responsibility and continue to address the issues that brought the family to DCFS's attention. DCFS recommended Mother and Father receive monitored visitation and reunification services.

III.   *Jurisdiction and Disposition*

At the jurisdictional hearing on July 13, 2022, Father submitted certificates of completion of a substance abuse program and classes on parenting, anger management, and domestic violence; an employment reference letter from the treatment program; and reports from negative drug tests between May through July 2022.

The juvenile court struck the allegation that Father had mental problems that rendered him incapable of providing care to L.J.; sustained the substance abuse claim as to Father as amended to remove language alleging Mother failed to protect

L.J.; and sustained as pleaded the substance abuse and mental health allegations concerning Mother.

In September 2022, DCFS reported the following information to the juvenile court: Mother was not testing for drugs or alcohol but said her doctor would arrange it. Mother updated DCFS on her psychiatric medications and provided her medical marijuana card. Mother's doctor confirmed Mother's medications and medical marijuana card and said she could start randomly testing Mother for drugs and alcohol. Father had seven negative drug tests in July and August 2022 and one no-show. He had documented his Alcoholics Anonymous attendance in July and August 2022.

In October 2022, DCFS advised the court that Father had tested negative for drugs five more times and continued to attend Alcoholics Anonymous meetings. DCFS had not received any updates on Mother's progress from her psychiatrist despite leaving many messages for her.

At the dispositional hearing on October 10, 2022, Mother was asked her position on removing L.J. from parental custody. Mother's counsel said, "Your Honor, submitted as to removal. The mother believes that the minor is suitably placed. Her only real request at the moment is just for her visitation to continue." Father requested L.J. be released to him.

As for the parents' case plan, Mother's counsel argued it was not necessary for her to complete a full drug and alcohol program. Counsel said, "Looking at the sustained petition, particularly the substance abuse and how long ago that was, I just don't think it is really necessary for Mother to do a whole drug or alcohol program. I don't have an objection to counseling, but again, it seems that the Department is treating Mother as,

you know, she is still in her first case back in a different jurisdiction, and it is pretty clear that Mother has been sober for quite some time. To tell her to get into a full program . . . in North Dakota based on the evidence that was in the jurisdiction report, Your Honor, I just don't think that is enough. So, again, no objection to testing, no objection to individual counseling, but as to the rest of the case plan, Your Honor, I would object."

The court declared L.J. a dependent child, removed her from her parents' custody, and ordered monitored visitation and reunification services. Mother and Father were ordered to undergo a full drug/alcohol program with aftercare and weekly drug and alcohol testing; a parenting course; individual counseling on case issues, child protection, the effect on children of untreated mental health concerns and substance abuse, healthy relationships, and co-parenting; and mental health counseling. Both parents appeal.

## DISCUSSION

### I. *Jurisdictional Findings*

Mother argues the jurisdictional findings against her must be vacated because they were premised on an improper allocation of the burden of proof and insufficient evidence. DCFS argues Mother's challenge to the jurisdictional findings is non-justiciable because L.J. will remain a dependent child of the juvenile court based on the findings against Father that he has not appealed. DCFS contends Mother consented to removal at disposition and therefore there are no identified adverse consequences to the jurisdictional findings that would warrant the findings' review. In an abundance of caution, we address Mother's claims on the merits.

A.    Burden of Proof

Mother argues the juvenile court erroneously placed the burden of proof on her at the jurisdictional hearing and required her to prove the absence of risk to L.J.  Mother's argument is based on two comments made by the court while describing its reasoning for finding the substance abuse and mental health issue allegations true.  The court said it found the substance abuse allegation true as amended for the reasons argued by L.J.'s counsel "and Mother's own statements indicating that once she lost custody in the prior case, she did turn to drugs.  There is not clear evidence that she has fully addressed her substance abuse problem, and she has a history of abusing very serious drugs, including heroin.  And this [b-2] count ties to her mental health problems in that she appears to turn to substances when her mental [health] problems become aggravated."  When discussing the mental health allegation, the court commented, "Mother acknowledges that she has turned to substances because of her mental health problems and we don't have sufficient evidence here that Mother is fully addressing her mental health problems, as she claims."

While it is beyond question that Mother did not bear the burden of proof at the jurisdictional hearing (*In re I.J.* (2013) 56 Cal.4th 766, 773), we do not conceive it to be a misallocation of the burden of proof for the juvenile court to observe that Mother's assertions that her drug and mental health problems were all relegated to the past had not been substantiated by DCFS's investigation.  Mother had struggled with mental health issues for more than half her life.  At age 13 she was diagnosed with bipolar disorder, anxiety, and depression.  Mother was twice hospitalized for psychiatric issues as a teenager, and she had

16

engaged in self-harm. In 2019 or 2020 L.J. and her half-sibling became dependents of the juvenile court in part because of Mother's untreated schizophrenia and refusal to comply with her medication regimen. However, Mother denied the impact her untreated mental health issues had on her children, claiming DCFS had "switched the issue" in the prior dependency proceedings to her psychiatric problems when their allegation she had committed child abuse did not pan out. In that prior case, Mother had refused to undergo a psychiatric evaluation and was limited to supervised visitation with L.J. because she failed to complete her programs, but she claimed she had done all the court asked and did not know why she failed to reunify. Despite longstanding, unresolved mental health problems that had led to dependency jurisdiction and losing custody of her children, Mother advised DCFS she had "been emotionally stable for a long time now."

Mother had also engaged in long-term substance abuse. At age 14 she took experimental drugs with Father, and later she began smoking "spice." The maternal grandparents confirmed Mother used drugs as a teenager, and the maternal step-grandmother reported Mother was addicted to pills and alcohol. Mother admitted turning to drugs to make herself feel better when her children were removed from her custody. She had used heroin and opiates. She moved to North Dakota in the hope of breaking her drug addiction, but two days after she arrived, she overdosed on heroin. Mother claimed she was now sober and she had achieved sobriety without attending a substance abuse program or drug counseling. She said she was willing to drug test, but she never tested. She told DCFS she planned to enroll in substance abuse counseling "soon," but the record does not

17

show she ever did.  In this factual context, we do not believe the court improperly shifted the burden of proof at the jurisdictional hearing by observing there was no basis to conclude Mother's chronic issues were now all in her past as she had represented to DCFS.

### B.      Sufficiency of the Evidence

Section 300, subdivision (b)(1) provides that the court may exercise jurisdiction over a child who has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the failure of the parent adequately to supervise or protect the child, or to provide regular care for the child due to the parent's mental illness or substance abuse. Jurisdictional findings are reviewed for substantial evidence and are affirmed when there is reasonable, credible evidence of solid value to support them.  (*In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.)  " ' "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  "[W]e do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there

is substantial evidence to support the conclusion that the court did draw." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

Mother challenges the exercise of jurisdiction on the basis of her mental and emotional health problems, relying on *In re James R.* (2009) 176 Cal.App.4th 129, abrogated on a different ground in *In re R.T.* (2017) 3 Cal.5th 622, 629; *In re David M.* (2005) 134 Cal.4th 822, abrogated on a different ground in *In re R.T.*,at p. 629; and *In re Joaquin C.* (2017) 15 Cal.App.5th 537 for the proposition that a parent's mental health problem is not alone enough for dependency jurisdiction; it must present a current risk of harm to the child. This principle is unquestionably true, but that is not the situation presented here. Mother had recently been proven to present a risk to her children due to her mental health issues. She claims on appeal that there is no indication the mental health allegation was found true in the prior dependency case, but the jurisdictional/dispositional report states, "The following petition was sustained:" and then lists four counts, one of which is the mental health allegation. Mother, whose mental and emotional health problems had recently been found to place her children at risk of serious physical harm, had refused to undergo psychological assessment, had turned to abusing heroin when her mental health problems led to her losing custody of her children, had failed to complete court-ordered counseling and treatment and therefore had failed to reunify with her children, would not acknowledge that her mental health problems had led to her children's dependency and acted as though her mental health problems had been a pretext in the prior case, and insisted she had been emotionally stable for a long time despite all the evidence to the contrary. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.*

19

(2012) 203 Cal.App.4th 188, 197.) Given Mother's longtime mental health issues; the interplay of her mental health issues and abuse of heroin; her denial that her mental health problems had created a risk of serious physical harm to her children; and her wide-ranging denial and persistent blaming of others, there was substantial evidence from which the court could infer there was a substantial risk Mother would again fail to protect L.J. The evidence was sufficient to support the findings against Mother under section 300, subdivision (b)(1) on this ground, and we therefore need not consider the sufficiency of the evidence to support jurisdiction based on Mother's substance abuse. (*In re J.L.* (2014) 226 Cal.App.4th 1429, 1435 [when one basis for jurisdiction is supported by substantial evidence, court does not need to consider sufficiency of evidence to support other bases].)

II.    ***Removal Order***

Both parents challenge the removal of L.J .from their custody. Children may not be removed from parental custody unless there is clear and convincing evidence of a substantial danger to their physical health, safety, protection or physical or emotional well-being and there are no reasonable means by which they can be protected without removal. (§ 361, subd. (c)(1).) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170, disapproved on other grounds by

20

*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)
Removal may not be based solely on past abuse; it requires an
"ongoing or future danger" to the child. (*In re A.E.* (2014)
228 Cal.App.4th 820, 826.)

A removal order is reviewed for substantial evidence. (*In re
Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "When reviewing a
finding that a fact has been proved by clear and convincing
evidence, the question before the appellate court is whether the
record as a whole contains substantial evidence from which a
reasonable fact finder could have found it highly probable that
the fact was true. In conducting its review, the court must view
the record in the light most favorable to the prevailing party
below and give appropriate deference to how the trier of fact may
have evaluated the credibility of witnesses, resolved conflicts in
the evidence, and drawn reasonable inferences from the
evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at
pp. 1011–1012.)

A.    Removal from Mother

At disposition, when asked her position on the question of
removal, Mother agreed L.J. was suitably placed with the
maternal grandparents, requested continued visitation, and then
submitted. We are aware that a claim of insufficient evidence to
support a dispositional order in a dependency matter generally is
not forfeited even if not raised below (*In re R.V.* (2012)
208 Cal.App.4th 837, 848). However, Mother did not simply fail
to contest a dispositional order; she agreed to her child's
placement out of her custody. Mother may not now argue
removal was inappropriate. (*In re N.S.* (2020) 55 Cal.App.5th
816, 840 [party forfeits the right to challenge a ruling on appeal
by agreeing to it; mother's express agreement at trial that the

21

juvenile court was not required to order a particular permanent plan forfeited the right to claim on appeal that the court was required to order that plan]; *In re A.S.* (2018) 28 Cal.App.5th 131, 151 [parents forfeited their right to claim on appeal that the court improperly limited hearing's scope by expressly agreeing to the scope of hearing].)

Mother next appears to argue that because she agreed at disposition that L.J. was suitably placed with the maternal grandparents, there was no basis for removal—in other words, because Mother did not oppose L.J.'s removal, removal was not appropriate.

This is not the legal standard for removal. (See § 361, subd. (c)(1).) We are unaware of any legal authority supporting Mother's argument, and the authorities on which she relies are inapposite. First, Mother quotes language in *In re Isayah C.* (2004) 118 Cal.App.4th 684 stating that a parent may retain legal custody of a child while that child is temporarily cared for by a third party. The *Isayah C.* court was considering whether a nonoffending parent's plan to send his child to stay with relatives during a brief incarceration was a sufficient showing of detriment under section 361.2, subdivision (a) to permit the court to deny placement to that nonoffending parent. (*Isayah C.*, at pp. 699–700.) Mother is not a nonoffending noncustodial parent requesting custody of her child, nor did she send L.J. to the maternal grandparents—DCFS detained L.J. before the petition was filed, and at the detention hearing the court ordered continued detention pursuant to section 319 and gave DCFS discretion to release her to relatives.

22

Next, Mother quotes a passage from *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated on a different ground in *In re R.T.*, *supra*, 3 Cal.5th at p. 629: "[T]he fact that a child has been left with other caretakers will not warrant a finding of dependency if the child receives good care." L.J. was not found to be a dependent child because she was left with other caretakers, nor did Mother leave her with the maternal grandparents; and *In re Rocco M.* involved a challenge to jurisdictional findings, not a dispositional order. (*In re Rocco M.,* at p. 826.) Neither case has any application here. Mother has not established error in the juvenile court's removal order.

### B.    Removal from Father

Father argues clear and convincing evidence did not support removing L.J. from his custody. He recites the many positive steps he had taken and the progress that he made after L.J. was removed from his care. He contends the court erred in removing L.J. from his custody because DCFS failed to prove there were no reasonable means by which she could be protected short of removing her. Specifically, he contends L.J. could have been returned safely to him on the condition that he continue to participate in services, stay in touch with social workers, and reside with relatives.

Father fails to demonstrate any of these conditions would have alleviated the concerns for L.J.'s safety. Initially, in May 2022, Father admitted he had used drugs since "well before" he was a teenager, abused marijuana and alcohol, got high on nitrous oxide, and used methamphetamine for the previous six months. But then in June 2022, having nearly completed his treatment program, Father insisted he did not have a substance abuse problem. He told DCFS he only used marijuana and

alcohol once or twice per month, he disputed whether nitrous oxide should be considered a drug, and he claimed he had only used methamphetamine once, under pressure. Father denied needing substance abuse treatment and said he entered the rehabilitation program as a prophylactic measure.

Father also dramatically minimized the severity of his aggression when under the influence. Downplaying the May 2022 incident, Father said the methamphetamine "didn't work well" for him and made him feel panicky and like he was going to have a heart attack, so he directed his mother to call 911. In reality, Father was breaking windows and possessions in his mother's home, tried to throw his mother out a window, consumed rubbing alcohol and ink, and was taken away by police on a section 5150 hold as a danger to himself and others. Father denied a history of aggressive behavior or any incidents other than the one that led to his hospitalization, but L.J. described Father acting aggressively and scratching people when he ingested substances and got "big eyes."

In light of Father's denial of his substance abuse problem, his rationalization of drug use and minimization of his drug-fueled violence, all of which occurred despite his participation in an inpatient treatment program and contact with social workers, we cannot conclude that ordering him to continue to participate in services and stay in touch with social workers would have been sufficient to keep L.J. safe in his custody. Moreover, living with relatives would not ensure L.J.'s safety, because Father was violent toward family when he was high: L.J. described Father scratching the paternal grandparents when he drank, and Father tried to defenestrate his mother during his methamphetamine-fueled rampage in May 2022. The risk Father posed when using

24

substances, combined with his denial and minimization, made less drastic solutions short of removal insufficient to protect L.J. Based on the record and taking into account the clear and convincing burden of proof required for removal (see *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012), we conclude substantial evidence supports the court's order removing L.J. from Father's custody.

III.   ***Mother's Drug Treatment and Testing Order***

Mother contends the order requiring her to participate in a full drug/alcohol treatment program with aftercare and drug testing must be reversed because there was no substantial evidence she was abusing drugs or had a substance abuse problem negatively impacting her parenting.

Mother consented to a drug testing requirement at the disposition hearing, so she may not now argue against it. (*In re N.S.*, *supra*, 55 Cal.App.5th at p. 840.) As for the order of a full drug program, to which she did object at disposition, we conclude the order was supported by substantial evidence. Mother had a long-term substance abuse problem dating back to her teenage years that included a variety of drugs and a heroin overdose the prior year. She claimed to be sober at present but she also had inconsistently reported her drug use history, and claimed to have recently quit using heroin instantaneously and without a treatment program, drug counseling, or support, all of which permitted the court to conclude she continued to have a substance abuse issue. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601 ["The juvenile court was entitled to conclude the mother had been transparently dissembling about her drug use. A reasonable inference was the mother was trying to hide her ongoing addiction. The trial court was entitled to draw this

25

reasonable inference"], disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18.)  At best, her sobriety was nascent and had indications of fragility:  Mother had not undergone drug treatment or counseling, she had no emotional support system, and, of particular concern given that L.J. was being removed, Mother had a history of turning to drug abuse to make herself feel better when her children were removed from her custody during dependency proceedings.  Based on this evidence the juvenile court was well within its discretion to order Mother to participate in a drug treatment program.  Section 362, subdivision (a) provides that when a child is adjudicated a dependent of the juvenile court, "the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child."  The court has broad discretion in fashioning dispositional orders in keeping with its duty to protect dependent children.  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006–1008.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.                          VIRAMONTES, J.

26